Filed 2/14/22  Burgardt v. The Golden 1 Credit Union CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DWAINE BURGARDT, | C092637 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2019-00263962-CU-BC-GDS) |
| v. | |
| THE GOLDEN 1 CREDIT UNION, | |
| Defendant and Appellant. | |

The Golden 1 Credit Union (Golden 1) appeals from denial of its motion to compel arbitration of a putative class action challenging the assessment and collection of insufficient fund fees.  Golden 1 contends the superior court erred in determining that it failed to show that Dwaine Burgardt received notice of an arbitration provision Golden 1 introduced in 2019.  When Burgardt opened an account with Golden 1 in 2013, he signed an application that included his agreement to Golden 1's terms and conditions but did not mention arbitration or that Golden 1 could unilaterally amend the terms and conditions. We conclude that the trial court did not err in denying the motion to compel arbitration.

1

## BACKGROUND

On September 3, 2019, Burgardt filed a putative class action complaint against Golden 1. Burgardt alleged he brought this action for himself and others similarly situated with Golden 1 checking accounts to remedy Golden 1's "unlawful assessment and collection of multiple insufficient fund fees for the same debit transaction . . . ." Burgardt alleged he used his debit card to pay a Sprint charge of $67.78. Golden 1 determined that his account did not have sufficient funds and charged him an insufficient funds fee of $27.50. Five days later, Golden 1 charged another $27.50 for the same item. Burgardt alleged claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition (Bus. & Prof. Code, § 17200 et seq.), violation of the Consumers Legal Remedies Act (Civ. Code, § 1761, subd. (e)), unjust enrichment, and money had and received.

On January 10, 2020, Golden 1 moved to compel arbitration and stay the action pending arbitration under the Federal Arbitration Act (9 U.S.C. §§ 2-4). Golden 1 contended that Burgardt "agreed to the Golden 1 arbitration agreement when he had notice of and an opportunity to review and opt out of the arbitration agreement, did not opt out, and continued to maintain his Golden 1 account and to use Golden 1's services."

Golden 1 supported the motion with the declaration of its vice-president, Paul Sidhu. Sidhu described the results of his review of Burgardt's account regarding his notice of the account's terms and conditions, including an arbitration provision Golden 1 introduced in 2019: "In December 2013, Plaintiff Dwaine Burgardt opened a share account and checking account with Golden 1 by applying in person at a Golden 1 branch. I am attaching as **Exhibit A** a true and correct, redacted copy of the 'Application for Membership' that Mr. Burgardt signed when he opened his accounts. Directly above the box containing his signature (provided under penalty of perjury) appeared the following notice: 'I will read and accept all terms and conditions or notify The Golden 1 Credit Union to close this account. [I] have or will receive a copy of the Golden 1 Credit

2

Union's Disclosure of Account Information and Fee Schedule. [I] agree that it is incorporated into this agreement and [I] agree to its terms and conditions.' . . . In January 2014, Mr. Burgardt signed up to receive his bank statements online, via online banking. When he did so, he first had to affirmatively consent to electronic delivery of all disclosures and notices. Since signing up to receive his bank statements online, Mr. Burgardt has received an email around the fifth of each month notifying him that his online statement was available to view."

Golden 1's 2013 account disclosure was not attached to Sidhu's declaration, nor was Burgardt's 2014 consent to electronic delivery of disclosures and notices.

Sidhu's declaration further stated that, in November 2015, Golden 1 revised its account disclosure, setting forth its insufficient funds fee procedure charging " 'per' 'item presented for payment' and returned unpaid for insufficient funds."

The revised disclosure also stated that "[t]o the extent that the terms contained in this disclosure are different than those in any other previous agreement or terms of account, this disclosure shall control and be deemed to modify such other agreements or terms of account. This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules."

The revised disclosure further stated: "We may change our bylaws and any term of this agreement. Rules governing changes in rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes we will give you reasonable notice in writing or by any other method permitted by law. . . . If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s)."

Sidhu described Golden 1's introduction of an arbitration provision into its terms and conditions: "Golden 1 revised the Account Disclosure, effective July 1, 2019, to

3

include an agreement to arbitrate all disputes through individual arbitration." This revised disclosure contained identical language to the 2015 revision regarding modification of prior disclosures and the member's agreement to the modified rules, as well as the language regarding changes to any bylaw or term.

The arbitration provision states that Golden 1 will attempt to resolve a dispute with a member informally but if unable to, "then you and we agree that it will be resolved as provided in this Arbitration Provision." The arbitration provision contains an advisement in all capitals, bold text that the provision limits the member's rights to bring a court action, a jury trial, participate in a class action, conduct discovery and appeal. The arbitration provision permits those who became a member prior to June 30, 2019, to opt out of arbitration by mailing or personally delivering a written opt-out request by August 31, 2019.

Sidhu described how Golden 1 members received notice of the arbitration agreement: "In early July 2019, Golden 1 disclosed the arbitration agreement to all members. It did so in two ways, depending on how members elected to receive their bank statements. Members who elected to receive paper statements received the arbitration agreement in the mail, as a stand-alone insert with their statement. It is Golden 1's practice to include important notices to members who receive printed statements in this way. Members who elected to receive online statements received an email notifying them their online statement was available for review, and had the opportunity to review the arbitration agreement via a link on the 'View Statements' page of their online banking account. More specifically, the 'View Statements' page allows members to choose by month and year which statements they want to view. A member cannot view his online bank statement without first visiting the 'View Statements' page and selecting on that page which statement the member wishes to view. The 'View Statements' page displays the bolded heading '**Statement Inserts**,' which heading is visible on the 'View Statements' page without having to scroll. By July 5, 2019, a blue,

4

hyperlinked, underlined notification entitled 'Arbitration Provision' appeared under that bolded '**Statement Inserts**' heading. It is Golden 1's practice to list under the '**Statement Inserts**' heading any important member notifications. Clicking on that link took the member to a PDF of the Arbitration Provision, which was the same document as the mailed arbitration provision sent to members who received notice via paper statements." Sidhu attached a copy of the arbitration provision, which was headed "IMPORTANT NOTICE" but otherwise identical to the arbitration provision in Golden 1's 2019 account disclosure.

Sidhu concluded with the statement that he had reviewed Burgardt's banking logs and determined that Burgardt had logged on to his online account six times in July 2019. Sidhu also determined from Golden 1's records that Burgardt did not opt out of the arbitration provision and continued to use his Golden 1 account and debit card.

In opposition to the motion, Burgardt declared, inter alia: (1) he did not see a July 2019 e-mail that Golden 1 claimed it sent notifying Burgardt that his online statement was available for review; (2) he logged on to his account "to conduct day-to-day financial business" but "did not see any notice regarding a 'Statement Inserts' heading or an 'Arbitration Provision' "; (3) he "was not aware that Golden 1 had inserted an arbitration provision into the July 1, 2019 version of its Account Agreement, or that [he] had a right to opt out of the arbitration provision"; and (4) "[h]ad Golden 1 given [him] actual notice of the arbitration provision it slipped into the July 1, 2019 version of the Account Agreement, [he] would have exercised [his] right to opt-out."

On July 10, 2020, after argument and submission by counsel for the parties, the trial court affirmed its tentative ruling denying Golden 1's motion to compel arbitration. The court reasoned that its role under the Federal Arbitration Act was limited to determining if a valid arbitration agreement exists and whether the agreement encompasses the parties' dispute. The threshold question was whether there was an agreement to arbitrate, an issue which was for the court to decide. The court said that,

when determining whether the parties agreed to arbitrate a certain matter, ordinary, state-law principles regarding contract formation are applied.  To form a contract under California law, manifestation of mutual assent was required, which was determined under an objective standard applied to the reasonable meaning of the parties' words and acts.

The court then examined the principles applied to "clickwrap" agreements on the Internet, where a user has to click an "I agree" button to listed terms and conditions, versus a "browsewrap" agreement, where use constitutes agreement to terms and conditions accessible by a hyperlink on the web page.  The validity of a browsewrap agreement depends on whether the user had actual or constructive knowledge of the website's terms and conditions.  Absent actual notice, the validity of a browsewrap agreement depends on whether the website puts a reasonable prudent user on inquiry notice of the contract terms, which in turn depends on the design of the website, i.e., how conspicuous were the website's hyperlinks to the terms and conditions.

The court concluded that Golden 1 had not shown that its browsewrap agreement put a reasonably prudent user on inquiry notice of the terms and conditions, because Golden 1 had not provided (1) a copy of the e-mail sent to Burgardt informing him that his online statement was available for view or (2) a screenshot of Golden 1's website. Further, the court found that Sidhu's description of the e-mail, Golden 1's website, and Burgardt's logins in July 2019 did not show that Burgardt had sufficient notice of the arbitration provision.

The court concluded that "[i]nserting a single hyperlink on a webpage not immediately visible on a customer's online banking account" was insufficient to put a customer on inquiry notice of the arbitration provision.  Therefore, Golden 1 had not shown the existence of an enforceable arbitration provision.

## DISCUSSION

" 'Under "both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate." ' [Citation.]  This

6

threshold inquiry stems from the ' "basic premise that arbitration is consensual in nature." ' [Citation.] 'The fundamental assumption of arbitration is that it may be invoked as an alternative to the settlement of disputes through the judicial process "solely by reason of an exercise of choice by [all] parties." ' [Citation.] Thus, notwithstanding ' "the cogency of the policy favoring arbitration and despite frequent judicial utterances that because of that policy every intendment must be indulged in favor of finding an agreement to arbitrate, the policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate." ' [Citation.]" (*Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855, 861; *Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 380 ["Because arbitration is a contractual matter, a party who has not agreed to arbitrate a controversy cannot be compelled to do so"].)

"The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) While Burgardt declares that he did not see an e-mail from Golden 1 informing him that his statement was ready for viewing or the "Statement Inserts" heading in the "View Statements" page of his online bank account with a hyperlink to the arbitration provision, he does not dispute that Golden 1 sought to give notice of the arbitration provision in this manner, i.e., that his online bank account included this information after July 1, 2019. Therefore, for purposes of the issue on appeal, the facts are not in dispute and we review de novo the trial court's denial of arbitration. (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

In deciding whether an agreement to arbitrate exists, courts "apply ordinary state-law principles that govern the formation of contracts." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944; *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1175 (*Nguyen*).) Under California state law, "[a]n essential element of any contract is the consent of the parties." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th

7

261, 270.)  "Mutual consent necessary to the formation of a contract 'is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.  [Citation.]' "  (*DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 813.)  "[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms.  A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing."  (*Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1049.)

Here, Golden 1 contends it gave sufficient notice of the changed terms of the account disclosure in 2019 to include an arbitration provision.  Therefore, "notice—actual, inquiry, or constructive—is the touchstone for assent to a contract, and the resulting enforceability of changed terms in an agreement."  (*Stover v. Experian Holdings, Inc.* (9th Cir. 2020) 978 F.3d 1082, 1086.)

Golden 1 concedes that, since Burgardt stated in his declaration that he did not have actual notice of the arbitration provision, Golden 1 had to show he had constructive notice.  "Constructive notice occurs when a consumer has inquiry notice of the terms of service and takes an affirmative action to demonstrate assent to them."  (*Needleman v. Golden 1 Credit Union* (2020) 474 F.Supp.3d 1097, 1103 (*Needleman*); *Nguyen, supra*, 763 F.3d at p. 1173.)  "Inquiry notice, in turn, hinges on whether a reasonably prudent user would have been aware of the applicable terms."  (*Needleman, supra*, 474 F.Supp.3d at p. 1103; *Specht v. Netscape Communications Corp.* (2d Cir. 2002) 306 F.3d 17, 31; Civ. Code, § 19 ["Every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he or she might have learned such fact"].)

8

Golden 1 contends that Burgardt "had constructive notice of the Arbitration Provision, because Golden 1 delivered it to him in the exact manner he requested," i.e., through his online bank account. While the trial court analyzed the notice issue based on case law involving clickwrap versus browsewrap agreements for contracts formed on the Internet, the contract between Golden 1 and Burgardt was not formed on the Internet. Golden 1 and Burgardt formed their agreement in an application form that Burgardt signed in 2013, in which he agreed to the "terms and conditions" set forth in Golden 1's "Disclosure of Account Information and Fee Schedule" incorporated in the application agreement.

Accordingly, case law regarding agreements entered into when customers open an account with bank or credit union are more apposite in determining whether Burgardt had notice that Golden 1 would and did change the terms and conditions of the account agreement, ultimately to include an arbitration provision. In this context, customers were generally found to be on notice of an arbitration provision if the signed agreement stated that: (1) the terms and conditions of the account agreement may be changed by the financial institution, and/or (2) referred to an existing arbitration provision. (See, e.g., *Marselian v. Wells Fargo & Co.* (N.D.Cal. 2021) 514 F.Supp.3d 1166, 1173-1174 [business account application stated that plaintiff confirmed receipt of, and agreed to be bound by, an account agreement that included an arbitration provision]; *Andre v. U.S. Bank N.A.* (C.D.Cal. May 20, 2021, No. CV 20-4854-CBM-(PJWx)) 2021 WL 3598737, *2 [2021 U.S.Dist Lexis 154737] ["it is undisputed that Plaintiff signed the signature card wherein she acknowledged receipt of the bank's terms and agreed to be bound by the terms of the Account Agreement which contained the arbitration provision"]; *Johnson v. JP Morgan Chase Bank, N.A.* (C.D.Cal. Sept. 18, 2018, No. EDCV 17-2477 JGB (SPx)) 2018 WL 4726042, *3-*4, *8 [2018 U.S.Dist. Lexis 167272] [plaintiffs signed signature cards agreeing to be bound by terms and conditions as amended contained in bank's rules and regulations, which included arbitration agreement]; *Daugherty v. Experian*

9

*Information Solutions, Inc.* (N.D.Cal. 2012) 847 F.Supp.2d 1189, 1195-1196 [rejecting claim that defendant had no right "to unilaterally amend the terms of the credit card agreement" to add arbitration provision in 2006 because "the cardholder agreements governing Plaintiff's credit card account since 1998 have all contained a change of terms provision"]; *Rudolph v. Wright Patt Credit Union* (Ohio Ct.App. June 30, 2021, No. 2020-CA-50) 175 N.E.3d 636, 641 [initial account agreement did not contain arbitration clause but stated that credit union could " 'change the terms of this Agreement and the other Account Documents at any time' "]; *BAM Navigation, LLC v. Wells Fargo & Co.* (D.Minn. Feb. 12, 2021, No. 20-cv-1345 (NEB/ECW)) 2021 WL 533692, *1 [2021 U.S.Dist. Lexis 27677] [plaintiff agreed in 2010 business account application to be bound terms and conditions that included modification and arbitration provisions].)

On the other hand, courts have held that, even if the account agreement contained a change-of-terms provision, an agreement that made no mention of arbitration did not provide notice of a change to add an arbitration provision, which exceeded the scope of the original agreement. The seminal case on this point is *Badie v. Bank of America* (1998) 67 Cal.App.4th 779 (*Badie*). In *Badie*, the court found that a change-in-terms provision did not allow a bank to add via notice an arbitration provision to the customer's original agreement. (*Id.* at p. 803.) The court said, "nothing about the original terms . . . would have alerted a customer to the possibility that the Bank might one day in the future invoke the change of terms provision to add a clause that would allow it to *impose* [alternative dispute resolution] on the customer." (*Id.* at p. 801.) A bank with a unilateral right to modify a contract does not have "carte blanche to make any kind of change whatsoever as long as a specific procedure is followed." (*Id.* at p. 791.) The change must be "a modification whose general subject matter was anticipated when the contract was entered into." (*Ibid.*) The court could not "assume . . . that notice alone, without some affirmative evidence of the depositor's consent, could bind a depositor to a

10

significant change regarding matters that were not addressed in the original contract at all." (*Id.* at p. 793.)[1]

The federal Sixth Circuit Court of Appeals applied *Badie* in *Sevier County Schools Federal Credit Union v. Branch Banking & Trust Co.* (6th Cir. 2021) 990 F.3d 470 (*Sevier*), holding that a change-in-terms provision did not permit the bank to make unreasonable changes, i.e., to add an arbitration agreement. (*Id.* at pp. 479-480; see also *Stone v. Golden Wexler & Sarnese, P.C.* (E.D.N.Y. 2004) 341 F.Supp.2d 189, 198 (*Stone*) ["The Court agrees with the *Badie* court that the terms discussed in the change-in-terms clause must supply the universe of terms which could be altered or affected pursuant to the clause. To hold otherwise would permit the Bank to add terms to the Customer Agreement without limitation as to the substance or nature of such new terms. There is nothing to suggest that plaintiff intended to give such unlimited power to the Bank, or that the law would sanction such a grant"]; *Martin v. Wells Fargo Bank, N.A.* (N.D.Cal. Dec. 2, 2013, No. C 12-06030 SI) 2013 WL 6236762, *3 [2013 U.S.Dist. Lexis 169807] ["[A]ddition of an arbitration provision is not a change to 'charges, fees, or other information,' the only aspects of the 1987 agreement Wells Fargo reserved the

---

[1]  Golden 1 contends that we cannot consider *Badie* because Burgardt raised it for the first time on appeal. " ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried." ' " (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 789.) However, the relevant facts are not in dispute. Golden 1 does not dispute that the 2013 application agreement did not refer to a potential arbitration provision, which Golden 1 unilaterally added in 2019. The 2015 revised disclosure referred to future amendment of the account terms and conditions, but also did not refer to an amendment to add an arbitration provision. "The rule against raising new issues on appeal . . . is not absolute. 'As an exception to the general rule, the appellate court has discretion to consider issues raised for the first time on appeal where the relevant facts are undisputed and could not have been altered by the presentation of additional evidence.' " (*Ibid.*)

11

right to change. There are no arbitration provisions within the 1987 agreement nor are there references to any form of alternative dispute resolution"].)

Golden 1 argues that *Badie* does not apply because Burgardt had the option to opt out of the arbitration provision. The Sixth Circuit in *Sevier* acknowledged that courts have declined to apply *Badie* "when the customers had a 'meaningful opportunity' to opt out of the arbitration provision." (*Sevier, supra*, 990 F.3d at p. 480, citing *Valle v. ATM National, LLC* (S.D.N.Y. Jan. 30, 2015, No. 14-cv-7993 (KBF)) 2015 WL 413449, *4 [2015 U.S.Dist. Lexis 11788]; *Howard v. Ferrellgas Partners, L.P.* (D. Kan. 2015) 92 F.Supp.3d 1115, 1138.) But the *Sevier* court continued that "still other courts . . . have applied *Badie* even where the plaintiffs *could opt out* of the new arbitration agreement." (*Sevier, supra*, at p. 480, citing *Follman v. World Financial Network National Bank* (E.D.N.Y. 2010) 721 F.Supp.2d 158, 165; *Stone, supra*, 341 F.Supp.2d at p. 198; but see *Ackerberg v. Citicorp USA, Inc.* (N.D.Cal. 2012) 898 F.Supp.2d 1172, 1176.) In *Stone*, the court found the right to opt out "not material to the outcome in *Badie*. As the *Badie* court itself noted, the material issue was what types of *terms* the contract allowed the bank to change, not whether the bank could add new terms. [Citation.] At its core, *Badie* held that the arbitration clause was not binding because it was not the type of change contemplated by the parties when they signed the original contract." (*Stone, supra*, at p. 196.)

Based on this case law in a similar context, we conclude that the trial court correctly denied Golden 1's motion to compel. The agreement contained in the application Burgardt signed in 2013 did not include a change-of-terms provision. The agreement incorporated the terms and conditions of the Disclosure of Account Information, but that document is not in the record and Sidhu's declaration does not state that it contained a change-of-terms provision. Sidhu states that in 2014 when Burgardt signed up for online banking he consented to electronic delivery of disclosures and notices, but that consent is also not in the record and Sidhu does not state that it contained

12

a change-of-terms provision. (Cf. *Page v. Alliant Credit Union* (N.D.Ill. May 18, 2020, No. 1:19-cv-5965) 2020 WL 2526488, *2 [2020 U.S.Dist. Lexis 86613] [rejecting plaintiffs' argument that they did not assent to arbitration agreement and could not opt out of agreement they did not know existed, because "the terms of their membership agreements allowed for electronic notice of amendments and plaintiffs agreed to such electronic notice"].) Obviously, neither the 2013 agreement nor 2014 consent mentioned arbitration, a provision that Golden 1 did not add until 2019. Golden 1's account disclosure revised in 2015 did contain a change-of-terms provision but did not mention arbitration. But, based on the record, Burgardt had not even previously agreed that Golden 1 could change any terms of the account disclosure. In sum, there is no evidence that Burgardt had notice in the critical 2013 and 2014 agreements that Golden 1 could unilaterally change the terms of the account agreement. When in 2015 the revised account disclosure so notified Burgardt, the change-of-terms provision did not indicate that a further revision would add an arbitration provision, which was in no way previewed in the 2013 application, the 2014 online banking consent, or the 2015 revised account disclosure.

Golden 1 leans heavily on *Needleman*, where the court granted a motion to compel arbitration of a putative class action brought against Golden 1 by a customer, who like Burgardt, signed up for an account and agreed to be bound by Golden 1's disclosure of account information. (*Needleman, supra*, 474 F.Supp.3d at pp. 1101-1102.) In 2016, the plaintiff Needleman enrolled in Golden 1's online statements program, clicking an " 'I Accept' " button consenting to receive online statements, " 'including all disclosures and notices provided with the same," and agreeing to be bound by " 'Any change in terms or subsequent disclosures applicable to your Online Statement.' " (*Id.* at p. 1101.)

In 2014, Needleman also enrolled in Golden 1's "online banking (separate from the online *statements* program) and 'consent[ed] to receive electronic communications, including consumer disclosures' on nearly identical terms" as the online statements

13

program.  (*Needleman, supra*, 474 F.Supp.3d at p. 1101.)  Needleman also accepted an online agreement and disclosure, which noted it was the member's responsibility to check for updates by electronic communication.  (*Ibid*.)  In the online agreement, Golden 1 members agreed (1) that communications from Golden 1 were deemed transmitted and received as soon as they were available in online banking, and (2) to promptly review communications when made available.  (*Ibid*.)

The court held:  "Here, the parties agree that Needleman consented to the terms of the 'Online Statements Consent and Online Banking Terms and Conditions' in 2016. That agreement necessarily informs how a reasonably prudent user would interact with Golden 1's online banking platform.  Golden 1 correctly argues that, pursuant to this election to receive online statements, a reasonable user in Needleman's situation would have understood this as an obligation to utilize the 'View Statements' page to stay apprised of important disclosures.  Because Needleman explicitly accepted the terms of Golden 1's online statements program, he was 'on notice' that critical information would be conveyed to him online rather than through the mail.  From this 'View Statements' portal, the Arbitration Provision was a conspicuous link under the bold 'Statement Inserts' heading, visible without having to scroll.  A reasonable user who previously agreed to receive all important documents electronically through the 'View Statements' interface would be expected to utilize that very feature."  (*Needleman, supra*, 474 F.Supp.3d at pp. 1103-1104.)

The court in *Needleman* considered the trial court's ruling in this case, but deemed it "distinguishable and unpersuasive."  (*Needleman, supra*, 474 F.Supp.3d at p. 1104.) The court distinguished the superior court's decision because the e-mail to Burgardt and the " 'View Statements' " screen were absent in his case but were submitted in *Needleman*.  (*Ibid.*)  The court said the superior court's decision was unpersuasive because "the *Burgardt* court also glossed over the fact that the plaintiff had similarly consented to receiving bank statements online" and the court's browsewrap analysis was

14

inapposite because "Needleman is not an online shopper who chanced upon the Golden 1 website," but rather "a long-time customer who affirmatively elected to receive all important statements through the 'View Statements' portal." (*Id.* at pp. 1104-1105.)

We would distinguish *Needleman* in turn because Needleman's consent to the online statements program containing a change-of-terms provision was submitted in that case but no such consent from Burgardt was presented here. There is no reference in Sidhu's declaration to Burgardt clicking an "I accept" button. Indeed, there is no indication in Sidhu's declaration that Golden 1 has separate online programs with accompanying member consents and agreements. More significantly, *Needleman* did not consider *Badie* regarding the limitations on a change-of-terms provision.

Fundamentally, Golden 1 maintains that, after consenting to receive notices and disclosures via an electronic portal, by continuing to use the account after Golden 1 added the arbitration provision to the revised disclosure and posted a link on the portal, Burgardt consented to arbitration because he was on constructive or inquiry notice that disputes with Golden 1 were subject to arbitration unless he opted out within a specified period. However, "a party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so." (*Douglas v. United States District Court for Central District of California* (9th Cir. 2007) 495 F.3d 1062, 1066.) "Even if [the plaintiff's] continued use of [a] service could be considered assent, such assent can only be inferred after he received proper notice of the proposed changes." (*Ibid.*) Proper notice required advising Burgardt that Golden 1 could unilaterally change the terms and conditions of the account and that the changes could include arbitration, prior to posting a link on his online banking page to the arbitration provision. (See *Badie, supra*, 67 Cal.App.4th at p. 791 [distinguishing cases where "the modifications in question were specifically identified in the original contracts as changes that might be made in the future under certain circumstances"]; *Delp v. American Express Centurion Bank* (C.D.Cal. Mar. 4, 2008, No. SACV 08-0069 AG (MLGx)) 2008 WL 11422487

15

[2008 U.S.Dist. Lexis 124225] [enforcing arbitration agreement, because "the original Agreement had an entire section devoted to arbitration," which "warned California customers that it could be made to apply to them in the future"].)  Golden 1 did not give this notice here.  Therefore, Burgardt never consented to a change in the account's terms and conditions that included an arbitration provision.

## DISPOSITION

The order denying Golden 1's motion to compel is affirmed.  Burgardt shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                   /s/
                                         RAYE, P. J.


We concur:


   /s/
HULL, J.


   /s/
KRAUSE, J.

16